# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# JACKSONVILLE DIVISION

KENNETH LAMAR ELLINGTON,

                Petitioner,

vs.                            Case No.:   3:19-cv-1011-MMH-LLL
                                                 3:14-cr-153-MMH-LLL

UNITED STATES OF AMERICA,

                Respondent.

_____/

## <u>ORDER</u>

Petitioner Kenneth Lamar Ellington moves under 28 U.S.C. § 2255 to vacate his conviction and sentence. (Civ. Doc. 5, Amended § 2255 Motion; <u>see also</u> Civ. Doc. 5-2, Memorandum; Civ. Doc. 5-4, Affidavit; Civ. Docs. 5-6 through 5-14, Pet. Exhibits A through I).[1] In 2015, a jury convicted Ellington of two counts of bank robbery by intimidation, for which the Court sentenced him to 180 months in prison. (Crim. Doc. 93, Judgment). He challenges his convictions and sentence based on several allegations of ineffective assistance of counsel. The United States opposes the Amended § 2255 Motion. (Civ. Doc. 12, Response). Ellington filed a reply brief. (Civ. Doc. 19, Reply). Thus, the case is ripe for a decision.

---

[1]     "Civ. Doc. __" refers to entries on the civil § 2255 docket, No. 3:19-cv-1011-MMH-LLL. "Crim. Doc. __" refers to entries on the criminal docket, No. 3:14-cr-153-MMH-LLL.

Under 28 U.S.C. § 2255 and Rule 8(a) of the Rules Governing Section 2255 Proceedings[2], the Court has considered the need for an evidentiary hearing and determines that a hearing is unnecessary to resolve the merits. No evidentiary hearing is required because Ellington's allegations are affirmatively contradicted by the record, patently frivolous, or even assuming the facts he alleges are true, he still would not be entitled to relief. Rosin v. United States, 786 F.3d 873, 877 (11th Cir. 2015); see also Patel v. United States, 252 F. App'x 970, 975 (11th Cir. 2007).[3] For the reasons below, Ellington's Amended § 2255 Motion is due to be denied.

## I.    Background

In September 2014, a federal grand jury indicted Ellington on two counts of bank robbery by intimidation, in violation of 18 U.S.C. § 2113(a). (Crim. Doc. 1, Indictment; Crim. Doc. 59, Corrected Indictment). Ellington was no stranger to the criminal justice system. In 1996, he was convicted in the Northern District of Florida of two counts of bank robbery and two counts of Hobbs Act robbery, for which he spent nearly 17 years in prison. (See Crim. Doc. 88,

---

[2]    Rule 8(a) of the Rules Governing Section 2255 Proceedings expressly requires the Court to review the record, including any transcripts and submitted materials, to determine whether an evidentiary hearing is warranted before resolving a § 2255 motion.

[3]    The Court does not rely on unpublished opinions as binding precedent; however, they may be cited in this Order when the Court finds them persuasive on a particular point. See McNamara v. GEICO, 30 F.4th 1055, 1060–61 (11th Cir. 2022); see generally Fed. R. App. P. 32.1; 11th Cir. R. 36–2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

Presentence Investigation Report [PSR] ¶ 51; see also id. ¶¶ 40–50, 52). He left prison in 2012 and was serving a term of supervised release when he was indicted for the current offenses. Ellington pled not guilty to the charges.

At a pretrial hearing, Ellington complained that his attorney, Assistant Federal Defender Susan Yazgi, had not moved to dismiss the Indictment for lack of probable cause or to suppress DNA evidence. (Crim. Doc. 108, Motions Hearing Tr. Vol. I at 4–8, 11). The Court explained to Ellington that, under the Federal Rules of Criminal Procedure, there is no mechanism to dismiss a grand jury's indictment for lack of probable cause. Id. at 8–11. With regard to the potential motion to suppress, both the Court and Ms. Yazgi explained that under federal and state law, the police could swab Ellington for DNA upon his arrest. Id. at 11–15. Ellington questioned a discrepancy between two reports about the attribution rate of the major DNA profile recovered from some of the robbery evidence. Id. at 15. Ms. Yazgi explained that the discrepancy arose from the differing objectives of the two reports, id. at 16, and the Court explained that the discrepancy was no basis for excluding the DNA evidence, id. at 16–18. After covering some other matters and conferring with Ms. Yazgi, Ellington stated that he was satisfied with Ms. Yazgi's representation and wanted to proceed to trial with her. Id. at 18–23.[4]

---

[4]   Ms. Yazgi filed two motions in limine: the first to exclude any mention that a bank teller was pregnant when the robbery occurred (Crim. Doc. 44) and the second to exclude a late-disclosed report that Ellington's fingerprint was found on a black plastic bag containing

The case went to a jury trial a few days later. (See generally Crim. Doc. 82, Trial Transcript Vol. II; Crim. Doc. 83, Trial Transcript Vol. III; Crim. Doc. 84, Trial Transcript Vol. IV). The Eleventh Circuit aptly summarized the facts developed at trial as follows:

> On April 9, 2014, a man robbed TD Bank and, a few hours later, First Federal Bank. The banks are located about six blocks apart in Live Oak, Florida. The tellers at both banks gave similar descriptions of the robber: a black male, about six-feet tall, slender, and wearing a black long-sleeved shirt or jacket, a red, green, and yellow Bob Marley-style hat, and a beard and dreadlocks that appeared fake. Surveillance photos from each bank confirm that description.

> The robber committed both crimes in similar fashion. In the robbery at TD Bank, he walked in, approached a teller, and slid a book across the counter (no screen or barrier separated the robber and the teller). A demand note was on top of that book. The teller was so frightened that she read only the part of the note that said "give me your money." The robber told her to "hurry" several times and reached down in front of him as though he had a gun, prompting the teller to give him about $1,000 in cash and a dye pack. The robber left the bank, and an employee saw him run north up the street toward a real estate agency and then throw something down on the ground after the dye pack exploded.

> Two or three hours later, the robber walked into First Federal Bank, approached a teller (a glass window separated them), handed her a note demanding money, and told her to "hurry up so no one will get hurt." The teller was scared and gave him about $4,000 in cash. The robber left the bank and went across the street toward the parking lot of a Kentucky Fried Chicken ["KFC"] restaurant.

---

a disguise (Crim. Doc. 55). The Court granted the first motion in limine (Crim. Doc. 57) but denied the second because Ellington's fingerprint examiner had a chance to examine the latent fingerprint from the bag (see Crim. Doc. 104, Motions Hr'g Tr. Vol. II at 2–4).

Ellington also opposed a notice filed by the government under Federal Rule of Evidence 404(b), in which the government said it would introduce evidence that Ellington committed a third, uncharged robbery of a Citizens State Bank in Perry, Florida in February 2014. (Crim. Doc. 43, Supp. Rule 404(b) Notice; Crim. Doc. 45, Response to Supp. Rule 404(b) Notice). Ultimately, that evidence did not come in at trial.

Police officers collected evidence of the robberies from each bank. Just north of the TD Bank, near the real estate agency, the police found $915 in cash scattered on the ground, a demand note,[5] a book, and an exploded dye pack. The police spoke to a Kentucky Fried Chicken employee who had observed a black Dodge Charger parked in the restaurant's parking lot the morning of the robbery. Later that day, the car was gone but there was a garbage bag where the car had been. The police recovered the bag, which contained a fake beard, a Bob Marley-style hat with dreadlocks, and a black long-sleeved t-shirt.

The police sent that evidence to the state crime lab for analysis. Two days after the robbery, a crime lab analyst developed a fingerprint off the book the robber used in the TD Bank robbery and determined that the print belonged to Kenneth Ellington.[6] The analyst forwarded information to the Live Oak Police Department, and the detective investigating the case pulled Ellington's driver's license information and photo from a driver and vehicle information database. The database showed that Ellington lived in Quincy, Florida—about 100 miles from Live Oak—and that he owned a black Dodge Charger. The detective also saw that Ellington resembled the robber in the First Federal Bank surveillance photo. Based on that information, he obtained arrest warrants for Ellington.

On April 14, 2014, Ellington was arrested in Quincy while driving his black Dodge Charger. Two days later he was transferred to Live Oak, where officers obtained his fingerprints and a DNA sample. Crime lab analysts determined that a fingerprint on the garbage bag found at the Kentucky Fried Chicken matched Ellington's left ring finger and that the DNA on the robber's hat, beard, and shirt matched Ellington's DNA.[7]

---

5    "The first line of the demand note read 'All the money,' and the second line read 'Hundreds Fifties twenties only.'" (Footnote 1 in original).

6    "The analyst determined that the book fingerprint belonged to Ellington by running the print through the federal Integrated Automated Fingerprint Identification System database." (Footnote 2 in original).

7    "The crime lab used the Combined DNA Index System [CODIS] to determine that DNA evidence obtained from the robbery belonged to Ellington. The government, at the request of Ellington's counsel, agreed to not disclose to the jury that Ellington was already in that database and the fingerprint database." (Footnote 3 in original).

United States v. Ellington, 723 F. App'x 772, 773–74 (11th Cir. 2018) (footnotes in original and renumbered). In addition, a teller at TD Bank identified Ellington in court as the robber. Trial Tr. Vol. II at 69–70.

Ellington did not testify or present any witnesses during the three-day trial. But he questioned each witness and moved for a judgment of acquittal and a mistrial, both of which the Court denied. Trial Transcript Vol. III at 194–95, 197–201. After about two hours of deliberations, the jury found Ellington guilty of both counts. See Trial Transcript Vol. IV at 79–81; (Crim. Doc. 73, Jury Verdict). As the Eleventh Circuit observed, the evidence against Ellington was "very strong." Ellington, 723 F. App'x at 776 n.9.

Ellington proceeded to sentencing with a new attorney, Shawn Arnold. (See Crim. Doc. 101, Sentencing Transcript). A probation officer calculated a guidelines sentencing range of 63 to 78 months' imprisonment, based on a total offense level of 24 and a Criminal History Category of III. Id. at 21; see also PSR ¶ 98. The Court heard from Ellington on his factual objections to the PSR, which the Court overruled, Sentencing Tr. at 3–12, and then heard from the parties about the government's request for an upward departure and an upward variance, id. at 13–21.

The Court departed upward to a Criminal History Category of V, finding that a Criminal History Category of III substantially underrepresented the severity of Ellington's criminal record and the likelihood he would commit

further offenses. Id. at 21–23; U.S.S.G. § 4A1.3. Ellington's resultant guidelines range became 92 to 115 months' imprisonment. Sentencing Tr. at 23. The Court further determined that the factors in 18 U.S.C. § 3553(a) warranted an upward variance. The Court explained that Ellington committed the bank robberies despite being on supervised release and having just spent nearly 20 years in prison for prior robbery convictions, that the crime was planned, and that the victims feared for their lives. Id. at 26–28. Thus, the Court imposed concurrent terms of 180 months' imprisonment for each count, to be served consecutively with whatever sentence was imposed in the Northern District of Florida for violating the conditions of supervised release. Id. at 27–28, 32–33; see also Judgment at 2. In the Statement of Reasons filed after sentencing, the Court gave as reasons for the upward variance the history and characteristics of the defendant; the need to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; the need to afford adequate deterrence; and the need to protect the public. (Crim. Doc. 94, Statement of Reasons at 3).

Ellington appealed the Judgment, chiefly arguing that (1) the evidence was insufficient to convict him of bank robbery by intimidation; and (2) the sentence was substantively unreasonable. Ellington, 723 F. App'x at 774, 776–77.[8] The Eleventh Circuit rejected these arguments and affirmed his convictions

---

[8]     Ellington raised a few other arguments on appeal, including claims that he was denied the right to confront the fingerprint analyst, that the government violated Brady v. Maryland, 373 U.S. 83 (1963), that there were chain-of-custody problems, that a government witness

and sentence. Id. at 774–78. Ellington petitioned the Eleventh Circuit for rehearing en banc or panel rehearing, but the court denied his requests on May 24, 2018. United States v. Ellington, No. 16–10273 (11th Cir.), Docket Entry of May 24, 2018. He did not petition the Supreme Court for certiorari review.

## II.   The Amended § 2255 Motion

These § 2255 proceedings timely followed. Ellington challenges his convictions and sentence based on ten grounds of ineffective assistance of counsel, but the grounds consist of overlapping, repetitive, and sometimes convoluted or unintelligible arguments.[9] That said, the Court has tried to reformulate, organize, and address each of the claims. Notably, many of the arguments reflect a fundamental misunderstanding by Ellington of the evidence admitted at trial, the sources of the evidence, and how the evidence was used (or not used) at trial and sentencing.

---

improperly commented on Ellington's right to remain silent, that his sentence was unconstitutional, and that his Fourth Amendment rights were violated. See Elllington, 723 F. App'x at 775 n.4, 776 n.9, 778 n.12. The Eleventh Circuit disposed of these arguments without much discussion. Id.

[9]   In addition to his Amended § 2255 Motion (Civ. Doc. 5) and Memorandum (Civ. Doc. 5-2), Ellington submitted an affidavit (Civ. Doc. 5-4), nine exhibits (Civ. Docs. 5-6 through 5-14), and a Reply (Civ. Doc. 19), all of which the Court has reviewed. To the extent the Affidavit or Reply allege facts or claims beyond those in the Amended § 2255 Motion and Memorandum, they are not properly before the Court. Rule 2(b) of the Rules Governing Section 2255 Proceedings requires that a petitioner "specify all the grounds for relief available to the moving party" and "state the facts supporting each ground" in the § 2255 motion. If a petitioner wishes to raise additional claims not included in the pleading, he must move for leave to amend. See Fed. R. Civ. P. 15. Ellington has not filed a motion for leave to amend. Thus, any allegations not contained in the Amended § 2255 Motion or Memorandum are not properly pled.

## III.   Discussion

Under Title 28, United States Code, Section 2255, a person in federal custody may move to vacate, set aside, or correct his sentence. Section 2255 permits collateral relief on four grounds: (1) the sentence was imposed in violation of the Constitution or laws of the United States; (2) the court lacked jurisdiction to impose the sentence; (3) the imposed sentence exceeded the maximum authorized by law; or (4) the imposed sentence is otherwise subject to collateral attack. 28 U.S.C § 2255(a) (2008). Only jurisdictional claims, constitutional claims, and claims of error that are so fundamentally defective as to cause a complete miscarriage of justice will warrant relief through collateral attack. United States v. Addonizio, 442 U.S. 178, 184–86 (1979); Spencer v. United States, 773 F.3d 1132, 1138 (11th Cir. 2014) (en banc) ("[A] district court lacks the authority to review the alleged error unless the claimed error constitute[s] a fundamental defect which inherently results in a complete miscarriage of justice." (internal quotation marks omitted)). The Supreme Court has recognized that a petitioner's claim that he received ineffective assistance of counsel in violation of the Sixth Amendment is properly brought in a collateral proceeding under § 2255. Massaro v. United States, 538 U.S. 500, 504 (2003).

To establish ineffective assistance of counsel, a § 2255 petitioner must demonstrate both: (1) that his counsel's conduct amounted to constitutionally

deficient performance, and (2) that counsel's deficient performance prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 687 (1984); Martin v. United States, 949 F.3d 662, 667 (11th Cir. 2020). In determining whether the petitioner has satisfied the first requirement, that counsel performed deficiently, the Court adheres to the standard of reasonably effective assistance. Weeks v. Jones, 26 F.3d 1030, 1036 (11th Cir. 1994) (citing Strickland, 466 U.S. at 688). The petitioner must show, in light of all the circumstances, that counsel's performance fell outside the "'wide range of professionally competent assistance.'" Scott v. United States, 890 F.3d 1239, 1258 (11th Cir. 2018) (quoting Payne v. Allen, 539 F.3d 1297, 1315 (11th Cir. 2008)). In other words, "[t]he standard for effective assistance of counsel is reasonableness, not perfection." Brewster v. Hetzel, 913 F.3d 1042, 1056 (11th Cir. 2019) (citing Strickland, 466 U.S. at 687). To satisfy the second requirement, that counsel's deficient performance prejudiced the defense, the petitioner must show a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. Martin, 949 F.3d at 667 (citing Padilla v. Kentucky, 559 U.S. 356, 366 (2010)). In determining whether a petitioner has met the two prongs of deficient performance and prejudice, the Court considers the totality of the evidence. Strickland, 466 U.S. at 695. However, because both prongs are necessary, "there is no reason for a court… to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes

an insufficient showing on one." Id. at 697; see also Wellington v. Moore, 314 F.3d 1256, 1261 n.1 (11th Cir. 2002) ("We need not discuss the performance deficiency component of [petitioner's] ineffective assistance claim because failure to satisfy the prejudice component is dispositive.").

A § 2255 movant "bears the burden to prove the claims in his § 2255 motion." Rivers v. United States, 777 F.3d 1306, 1316 (11th Cir. 2015); see also Beeman v. United States, 871 F.3d 1215, 1221–23 (11th Cir. 2017). If "'the evidence does not clearly explain what happened … the party with the burden loses.'" Beeman, 871 F.3d at 1225 (quoting Romine v. Head, 253 F.3d 1349, 1357 (11th Cir. 2001)). Moreover, a § 2255 movant is not entitled to a hearing, much less relief, "when his claims are merely conclusory allegations unsupported by specifics or contentions that in the face of the record are wholly incredible." Tejada v. Dugger, 941 F.2d 1551, 1559 (11th Cir. 1991) (citation omitted).

**A. Ground One: McCoy Error**[10]

Ellington first alleges that trial counsel, Susan Yazgi, gave ineffective assistance by failing to object to Jury Instruction Number 13. Am. § 2255 Mtn. at 4. The Court instructed the jury that because the parties had stipulated to

---

[10]    See McCoy v. Louisiana, 138 S. Ct. 1500 (2018). Ellington also argues that Ms. Yazgi performed unreasonably by failing to object to certain fingerprint and DNA evidence. These arguments overlap with Grounds Three, Five, and Six and are addressed there. Conversely, Ellington also repeats allegations related to the McCoy claim under other grounds, such as Ground Five. See, e.g., Memorandum at 11–12. For organizational purposes, the Court addresses the McCoy claim in full under Ground One.

certain facts, the jury could "accept those facts, even though nothing more was said about them one way or the other." Trial Tr. Vol. IV at 73.[11] But Ellington does not so much argue that the jury instruction was incorrect as much as he objects that his attorney agreed to any stipulations at all. He asserts that Ms. Yazgi stipulated to facts – and failed to object to the government's fingerprint and DNA evidence – without his consent or understanding and without the Court inquiring about the stipulations. See Am. § 2255 Mtn. at 4; Memorandum at 1–3. He argues that Rule 17.1 of the Federal Rules of Criminal Procedure ("Rule(s)") and former Local Rule 4.15[12] required the Court to conduct a formal inquiry before accepting any stipulation. Am. § 2255 Mtn. at 4. Ellington contends that, through stipulations, Ms. Yazgi conceded his guilt without his consent, depriving him of his Sixth Amendment right to decide whether to admit or contest guilt. In other words, Ellington alleges a McCoy error. See McCoy, 138 S. Ct. 1500; see also Am. § 2255 Mtn. at 5.

In McCoy, the Supreme Court held that a defendant charged with capital murder "has the right to insist that counsel refrain from admitting guilt, even

---

[11]    Jury Instruction Number 13 stated in full: "While we were hearing evidence, you were told that the Government and the defendant agreed, or stipulated, to certain facts. This means simply that they both accept the facts to which they stipulated. There is no disagreement over that, so there was no need for evidence by either side on these points. You may accept those facts, even though nothing more was said about them one way or the other." Trial Tr. Vol. IV at 73; see also Crim. Doc. 72, Court's Final Jury Instructions at 14.

[12]    Effective February 1, 2021, the Local Rules for the United States District Court for the Middle District of Florida ("Local Rule(s)") were revised and reorganized. Former Local Rule 4.15 is now Local Rule 3.05, which is substantially the same.

when counsel's experienced-based view is that confessing guilt offers the defendant the best chance to avoid the death penalty." 138 S. Ct. at 1505. There, the defendant was charged with murdering three members of his estranged wife's family but insisted he was innocent. Id. at 1505–06. His attorney determined the evidence of guilt was "overwhelming" and that the only hope of avoiding a death sentence was to admit guilt to the jury. Id. at 1506. Over the defendant's vehement protests, the trial court allowed the attorney to concede that the defendant killed the victims. Id. at 1506–07. The Supreme Court concluded that "[t]he trial court's allowance of [defense counsel's] admission of McCoy's guilt despite McCoy's insistent objections was incompatible with the Sixth Amendment." Id. at 1512. While certain tactical choices are left to the attorney, only the defendant can decide whether to maintain innocence or concede guilt, the Court reasoned. Id. at 1508. Such a "[v]iolation of a defendant's Sixth Amendment-secured autonomy ranks as" a "structural" error, meaning the defendant need not show prejudice. Id. at 1511.

Here, in contrast, Ms. Yazgi never conceded that Ellington was guilty of any charge, in violation of Ellington's Sixth Amendment autonomy. Ms. Yazgi made only two stipulations at trial: (i) that the manager of a KFC restaurant near the scene of the robberies, if called as a witness, would testify that Torian Ford, a person whom the police briefly stopped and questioned about the robberies, was working at the KFC when the robberies occurred, and (ii) that

law enforcement eliminated Ford as a suspect. Trial Tr. Vol. II at 174. There were no other stipulations at trial.[13] Ms. Yazgi had a strategic reason for making these stipulations: she wanted to admit a photo of Ford to show the jury that other suspects fit the robber's description. Trial Tr. Vol. II at 4–8, 168–69. The government objected that publishing a photo of Ford might confuse and prejudice the jury, id. at 8–10, but the Court was willing to allow the photo if the parties stipulated that Ford was not a suspect, see id. at 170–71. So, Ms. Yazgi stipulated that Ford was not a suspect in exchange for gaining admission of Ford's photograph. Far from conceding Ellington's guilt, these stipulations (which counsel made in Ellington's presence) were a strategically sound trade-off, for which the Court cannot fault counsel.

It is also true that Ms. Yazgi did not object to the admission of evidence showing that Ellington's fingerprints or DNA were found on several items associated with the bank robberies. But Ms. Yazgi never conceded that the fingerprint or DNA evidence established that Ellington committed the robberies. Ms. Yazgi minimized the value of the forensic evidence, arguing that

---

[13]     At a pretrial hearing, the prosecutor mentioned that he and Ms. Yazgi had stipulated to some other matters, but they were not stipulations the jury needed to hear or be instructed about. Motions Hr'g Vol. II (Crim. Doc. 104) at 7–8. The record is silent about what those stipulations were, but it does not change the Court's analysis under McCoy. Whatever those other stipulations dealt with, they did not deprive Ellington of his Sixth Amendment right to decide whether to admit guilt or maintain his innocence with respect to the charges presented at the trial. At trial, Ms. Yazgi zealously advocated that Ellington did not commit the robberies.

Ellington's fingerprints and DNA could have been transferred to the objects through fleeting contact and that the evidence did not show how long Ellington's fingerprints or DNA had been on the items. See Trial Tr. Vol. IV at 37–41 (closing arguments addressing DNA and fingerprint evidence); see also Trial Tr. Vol. III at 154–56 (cross-examination of Florida Department of Law Enforcement ["FDLE"] analyst about the limits of fingerprint evidence); id. at 183–90 (cross-examination of DNA analyst).

Ms. Yazgi's stipulations about Torian Ford and her decision not to object to the DNA and fingerprint evidence did not require Ellington's consent because these were the type of tactical choices that are the prerogative of defense counsel. While some decisions are reserved exclusively for the defendant – "notably, whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal" – other decisions are the province of the attorney, "such as what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence." McCoy, 138 S. Ct. at 1508 (internal quotation marks and citations omitted). "'[N]umerous choices affecting conduct of the trial' do not require client consent, including 'the objections to make, the witnesses to call, and the arguments to advance.'" Id. at 1509 (quoting Gonzalez v. United States, 553 U.S. 242, 249 (2008)). Contrary to Ellington's understanding, counsel does not have to obtain the defendant's consent to "every tactical decision," because otherwise "the

15

adversary process could not function effectively." <u>Taylor v. Illinois</u>, 484 U.S. 400, 417–18 (1988). As the Supreme Court has explained:

> Once counsel is appointed, the day-to-day conduct of the defense rests with the attorney. He, not the client, has the immediate—and ultimate—responsibility of deciding if and when to object, which witnesses, if any, to call, and what defenses to develop. Not only do these decisions rest with the attorney, but such decisions must as a practical matter, be made without consulting the client. The trial process simply does not permit the type of frequent and protracted interruptions which would be necessary if it were required that clients give knowing and intelligent approval to each of the myriad tactical decisions as a trial proceeds.

<u>Wainwright v. Sykes</u>, 433 U.S. 72, 93 (1977) (Burger, J., concurring); <u>accord</u> <u>Gonzalez</u>, 553 U.S. at 249 ("[T]o require in all instances that [tactical choices] be approved by the client could risk compromising the efficiencies and fairness that the trial process is designed to promote.").

Ms. Yazgi's decisions to stipulate that Torian Ford was not a suspect and not to object to the admission of certain fingerprint and DNA evidence fell well within the realm of tactical choices that are the defense attorney's domain. These are examples of attorney decisions about "what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence." <u>McCoy</u>, 138 S. Ct. at 1508 (internal quotation marks and citation omitted). They were not decisions about "what the client's objectives in fact <u>are</u>." <u>Id.</u> (emphasis in original) (citing <u>Weaver v. Massachusetts</u>, 137 S. Ct. 1899, 1908 (2017)). In making such stipulations (or non-objections), defense counsel did not concede Ellington's guilt or violate his ability to decide whether to maintain his

innocence. To the contrary, Ellington's counsel contested his guilt throughout trial, making the case that the evidence failed to prove beyond a reasonable doubt that he was the person who robbed the TD Bank and First Federal Bank. Because Ms. Yazgi's stipulations and non-objections did not amount to any concession of guilt or deprive Ellington of his Sixth Amendment autonomy, no McCoy error occurred.

Ellington also argues that Rule 17.1 and former Local Rule 4.15 required the Court to conduct some type of formal inquiry before accepting any stipulation. See Am. § 2255 Mtn. at 4. He is wrong. Rule 17.1 provides in relevant part: "The government may not use any statement made during the conference by the defendant or the defendant's attorney unless it is in writing and is signed by the defendant and the defendant's attorney." Fed. R. Crim. P. 17.1. Rule 17.1 requires no formal colloquy. Besides, Rule 17.1 is inapplicable because the government did not use at trial a "statement" made "during the [pretrial] conference" by the defendant or his attorney. Id.

As for former Local Rule 4.15, it provided:

> (a) No stipulation or agreement between any parties or their attorneys, the existence of which is not conceded, in relation to any aspect of any pending case, will be considered by the Court unless the same is made before the Court and noted in the record or is reduced to writing and subscribed by the party or attorney against whom it is asserted.

Local Rule 4.15(a) (before Feb. 1, 2021); accord Local Rule 3.05 (effective Feb. 1, 2021). Like Rule 17.1, former Local Rule 4.15 did not require the Court to

conduct a formal colloquy before accepting a stipulation, only that the party <u>or the party's attorney</u> agree to the stipulation on the record <u>or</u> in writing. Thus, Ellington identifies no violation of Rule 17.1 or former Local Rule 4.15 to which counsel could have objected. Because "[a] lawyer cannot be deficient for failing to raise a meritless claim," relief on this ground is due to be denied. <u>Freeman v. Att'y Gen.</u>, 536 F.3d 1225, 1233 (11th Cir. 2008) (citation omitted).

### B. Ground Two

Ellington also contends that appellate counsel, Shawn Arnold, gave ineffective assistance by failing to raise on direct appeal the <u>McCoy</u> error alleged in Ground One. Am. § 2255 Mtn. at 5; Memorandum at 4–6. Because the claims in Ground One lack merit, it was not unreasonable for appellate counsel not to brief those issues. <u>See</u> <u>Pinkney v. Secretary, DOC</u>, 876 F.3d 1290, 1297 (11th Cir. 2017) (appellate counsel does not perform deficiently by failing to raise a meritless argument). Besides, Mr. Arnold reasonably could have winnowed out weaker arguments in favor of arguments he perceived to be stronger. <u>See</u> <u>Payne v. United States</u>, 566 F.3d 1276, 1277 (11th Cir. 2009) (recognizing that appellate counsel has no duty to raise every nonfrivolous issue, but may weed out weaker arguments to focus on one or a few key issues (citations omitted)). Relief on Ground Two is due to be denied.

### C. Grounds One and Three: Failure to object to fingerprint evidence

Ellington argues that Ms. Yazgi gave ineffective assistance by failing to object to some of the fingerprint evidence admitted at trial. See Am. § 2255 Mtn. at 6; Memorandum at 6–8; see also id. at 1–3. His specific arguments are scattered and sometimes unclear. Still, he objects to the admission of Government's Exhibit 33 (also known by Exhibit "K-1"), one of three sets of fingerprint standards that an FDLE crime lab analyst used to match latent fingerprints to Ellington. (The other two sets of fingerprint standards were Government's Exhibits 34 and 35). He also contends that Ms. Yazgi should have objected to the testimony of the FDLE's fingerprint analyst, Marvin Stephens. Ellington argues that, but for Ms. Yazgi's failure to object to the fingerprint evidence and testimony, there is a reasonable probability the jury would have acquitted him.

### 1. *Exhibit 33's reference to an uncharged bank robbery*

Ellington's primary complaint about Exhibit 33 is that it contains a notation – an FDLE investigation number – referring to an uncharged bank robbery. See Am. § 2255 Mtn. at 6. Two months before the bank robberies at issue here, someone robbed a Citizens State Bank in Perry, Florida. See PSR ¶ 39. Ellington was a suspect in that robbery, but he was never arrested, charged, or convicted for it. Id. A month before trial, the government filed a notice that

it would introduce evidence that Ellington robbed the Citizens State Bank. Supplemental Rule 404(b) Notice (Crim. Doc. 43). Ms. Yazgi argued that any evidence of the uncharged bank robbery was unduly prejudicial and inadmissible. Response to Supp. Rule 404(b) Notice (Crim. Doc. 45). During a pretrial hearing, the Court suggested that it was unlikely to admit evidence about the uncharged bank robbery. Motions Hr'g Tr. Vol. I (Crim. Doc. 108) at 28–29. The government stated that it expected not to need that evidence, id. at 26–27, and ultimately, it never tried to use it.

Ellington now argues that Ms. Yazgi should have objected at trial to the admission of Exhibit 33 because the FDLE's investigation number for the Citizens State Bank robbery – FDLE Number ***390 – was written on it.[14] By allowing Exhibit 33 to be admitted with this notation, Ellington argues, Ms. Yazgi allowed the introduction of evidence showing that he was involved in the uncharged bank robbery. See Memorandum at 6–8.

Ellington's claim is meritless. The jury neither heard nor saw any evidence about the robbery of the Citizens State Bank. While Exhibit 33

---

[14]     Exhibit 33 contains three handwritten numbers in the upper righthand corner, which are FDLE lab identification numbers: 20140100**837**, 20140100**838**, and 20140100**390**. See Gov. Trial Ex. 33; see also Trial Tr. Vol. III at 136 (fingerprint analyst describing numbers as the lab investigation numbers). Ellington refers to these numbers by the FDLE investigation numbers: 40120100**837**, 40120100**838**, and 40120100**390**. See Memorandum at 1. For clarity's sake, the Court refers to the FDLE investigation and lab numbers interchangeably by their common terminal digits: ***390, ***837, and ***838. FDLE Number ***390 refers to the uncharged robbery of the Citizens State Bank, FDLE Number ***837 refers to the robbery of TD Bank charged in Count One of the Indictment, and FDLE Number ***838 refers to the robbery of the First Federal Bank charged in Count Two. (See Civ. Doc. 5-12, Pet. Ex. G).

contained three FDLE investigation numbers, including the investigation number for the Citizens State Bank robbery, the jury had no way of knowing what these numbers meant, let alone that FDLE Number ***390 referred to the robbery of another bank. Thus, there is no reasonable probability that the appearance of this number on Exhibit 33 affected the jury's deliberations. Ms. Yazgi did not give ineffective assistance by not objecting to Exhibit 33 only because it contained FDLE Number ***390.

Even if the jury somehow gleaned from the FDLE investigation numbers that Ellington was suspected of another robbery (however improbable), there still is not a reasonable probability that Ellington was prejudiced. The evidence against Ellington was overwhelming. See Ellington, 723 F. App'x at 776 nn.7, 9 (observing that "there was significant evidence against [Ellington]" and the evidence was "very strong."). A latent fingerprint on the driving manual carried by the robber in the TD Bank robbery matched Ellington's right little finger, and a latent print on the black plastic bag that contained the robber's disguise, which was found in the KFC parking lot after the First Federal Bank robbery, matched Ellington's left ring finger. Trial Tr. Vol. III at 123, 137–41. Ellington's DNA also matched the major DNA profile on the fake beard, hat with fake dreadlocks, and shirt that matched the description of items worn by the robber, which were found in the plastic bag. Id. at 176. Ellington's own fingerprint examiner, Gerald Cole, and Ellington's own DNA expert, Dr. Julie Heinig,

reviewed the fingerprint and DNA evidence, respectively, and neither disagreed with their FDLE counterparts' conclusions. <u>See</u> Pet. Ex. F (Civ. Doc. 5-11 (Cole's report examining fingerprints on driving manual)); Pet. Ex. B (Civ. Doc. 5-7 (Dr. Heinig's review of DNA evidence)); <u>see also</u> Motions Hr'g Tr. Vol. II at 2–4 (trial counsel confirmed that Cole had the materials to examine latent fingerprints on the black plastic bag, and trial counsel would call him to testify if he did not identify Ellington's fingerprint on the bag). In addition, L.W., a teller at TD Bank, identified Ellington in court as the perpetrator. Trial Tr. Vol. II at 69–70. The jury viewed surveillance images and video of the bank robber (Gov't Trial Exs. 1, 2, 11, 12), which the jury could have used to identify or eliminate Ellington themselves or to evaluate L.W.'s eyewitness identification. Plus, an employee at a nearby KFC restaurant testified about seeing an out-of-place black Dodge Charger parked behind the restaurant on the day of the robberies, and how she later discovered the bag containing the robber's disguise next to where the Charger had been parked. Trial Tr. Vol. II at 135–38, 143. As it turns out, Ellington drove a black Dodge Charger. Trial Tr. Vol. III at 82.

Given the overwhelming evidence against Ellington, there is not a reasonable probability that seeing FDLE Number ***390 on Exhibit 33 affected the jury's verdict, even if the jury knew what this number meant. <u>See</u> <u>Strickland</u>, 466 U.S. at 694. Relief on this claim is due to be denied.

## 2. *Dates of fingerprint matches and use of database*

Ellington argues that the fingerprint evidence was flawed because an FDLE crime lab analyst, Marvin Stephens, testified that he first matched a latent fingerprint on the driving manual to Ellington on April 11, 2014. See Memorandum at 2; see also Trial Tr. Vol. III at 123. Ellington contends that Stephens's account is impossible because Stephens did not obtain a copy of Ellington's fingerprint standards until April 14, 2014. Memorandum at 2. Therefore, Ellington argues, Ms. Yazgi performed unreasonably by not objecting to Stephens's testimony about identifying Ellington's fingerprint.

This argument does not warrant § 2255 relief because the underlying issue was raised and rejected on direct appeal. On appeal, "Ellington argue[d] that the DNA and fingerprint evidence is flawed because the crime lab analysts matched the DNA and fingerprints collected from the robbery evidence to him even before the police had arrested him and obtained his fingerprints and DNA." Ellington, 723 F. App'x at 776 n.8; see also United States v. Ellington, No. 16–10273 (11th Cir.), Appellant's Brief at 9–10. The court rejected that argument, explaining:

> True, but they were able to [identify Ellington's fingerprints and DNA before his arrest] because his fingerprints and DNA were already in the fingerprint and DNA databases. The jury heard that the fingerprints and DNA linked to the robbery matched Ellington but not that the match was made by means of databases based on criminal arrests or convictions. As a result, there is no merit to Ellington's argument that he was prejudiced because of how the matches were made. And nothing in the record supports his argument that the DNA evidence confused the jury.

Ellington, 723 F. App'x at 776 n.8.

Because the issue was resolved against him on direct appeal, Ellington is barred from re-arguing that the fingerprint evidence was flawed based on the analyst identifying a match before Ellington was arrested and his fingerprint standards obtained. "It is long settled that a prisoner is procedurally barred from raising arguments in a motion to vacate his sentence … that he already raised and that we rejected in his direct appeal." Stoufflet v. United States, 757 F.3d 1236, 1239 (11th Cir. 2014) (collecting cases); United States v. Nyhuis, 211 F.3d 1340, 1343 (11th Cir. 2000) ("Once a matter has been decided adversely to a defendant on direct appeal it cannot be re-litigated in a collateral attack under section 2255."). "The fact that [Ellington] now frames th[is] ground[] in terms of ineffective assistance, rather than trial-court error, does not make [it a] new claim[]." Fields v. United States, No. 18-14466-F, 2019 WL 3526490, at *1 (11th Cir. Feb. 21, 2019) (order denying certificate of appealability); see also Nyhuis, 211 F.3d at 1343 (recharacterizing a previously rejected claim under a different, but previously available, legal theory does not merit rehearing).

Ellington now argues that the Eleventh Circuit got it wrong because he denies that the FDLE analyst ever identified his fingerprints using a fingerprint database. Ellington asserts that "Ms. Yazgi knew [a fingerprint] match was not made by means of database based on a criminal arrest or conviction." Memorandum at 2 (citing Ellington, 723 F. App'x at 776 n.8).

In extraordinary cases, a post-conviction movant may overcome the bar against relitigating previously decided issues where "new evidence establishes an error of constitutional proportions or a 'fundamental defect which inherently results in a complete miscarriage of justice.'" Stoufflet, 757 F.3d at 1240–41 (quoting Hill v. United States, 368 U.S. 424, 428 (1962)). But Ellington points to no new evidence to support his conclusory assertion that Stephens, the FDLE fingerprint analyst, did not really identify Ellington's fingerprints using a fingerprint database. As reflected in discussions at a pretrial hearing and sentencing, there was no dispute that Stephens did, in fact, first identify Ellington's fingerprints using the Automated Fingerprint Identification System (or "AFIS"), a databank of known fingerprints. See Motions Hr'g Tr. Vol. I at 13–14, 49–50; Sentencing Tr. at 11–12. And it makes sense that Stephens would have done so. Ellington had several prior convictions, including federal convictions in 1996 for bank robbery and Hobbs Act robbery, PSR ¶¶ 40–52, so it follows that Ellington's fingerprints would have been in AFIS. And Stephens developed latent fingerprints on the driving handbook shortly after the robberies, Trial Tr. Vol. III at 121–23, so it makes sense that Stephens would have run those latent prints through AFIS. A subsequent comparison between a latent fingerprint on the handbook and a known set of Ellington's fingerprints (Exhibit 33) confirmed the match. Id. at 137. The defense's own fingerprint examiner, Gerald Cole, agreed that a fingerprint on the handbook matched

Ellington's right little finger. Pet. Ex. F (Civ. Doc. 5-11). As a result, Ellington fails to point to "an error of constitutional proportions or a 'fundamental defect which inherently results in a complete miscarriage of justice.'" <u>Stoufflet</u>, 757 F.3d at 1240. Relief on this claim is due to be denied.

### 3. *Authenticity of Exhibit 33*

To the extent Ellington argues that Exhibit 33 was not an authentic set of fingerprint standards, such that Ms. Yazgi unreasonably failed to object to Stephens's reliance on Exhibit 33 for his analysis and opinion, his claim is without merit.

By all appearances, Exhibit 33 contained a known set of Ellington's fingerprints. Exhibit 33 bore Ellington's full name, date of birth, Social Security Number, FBI identification number, state identification number, and other identifying information. Stephens compared the fingerprints in Exhibit 33 to two other sets of fingerprint standards, Exhibits 34 and 35, and determined that the fingerprints all came from the same person. Trial Tr. Vol. III at 137. Ellington does not dispute that Exhibits 34 and 35 were authentic sets of his fingerprints. It therefore follows that the fingerprint standards in Exhibit 33 were also Ellington's. And, as stated above, Ellington's own fingerprint examiner reviewed the latent fingerprints and Ellington's fingerprint standards but did not disagree with the conclusion that Ellington's prints were on the driving manual and black plastic bag. <u>See</u> Pet. Ex. F; Motions Hr'g Tr.

Vol. II at 2–4. Thus, Ms. Yazgi had no reason to contest whether Exhibit 33 was an authentic set of fingerprint standards.

### 4. Lack of peer verification of fingerprint analyst's work

Ellington argues that Ms. Yazgi gave ineffective assistance by not objecting to Stephens's opinion because he did not follow the "ACE-V" method in his examinations. See Memorandum at 2–3. "ACE-V," which stands for analysis, comparison, evaluation, and verification, is a widely accepted four-step process for making fingerprint identifications. See United States v. Scott, 403 F. App'x 392, 394–95 (11th Cir. 2010) (describing the ACE-V method in the context of fingerprint analysis). Ellington argues that Stephens failed to follow the final step because he did not have a second examiner verify his results. Thus, Ellington argues, Ms. Yazgi gave ineffective assistance by failing to argue that Stephens's methodology was unreliable.

The Eleventh Circuit has held in general that fingerprint evidence is reliable under the standards of Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and Federal Rule of Evidence 702. United States v. Abreu, 406 F.3d 1304, 1307 (11th Cir. 2005). However, neither the Supreme Court nor the Eleventh Circuit in a precedential opinion have addressed whether a fingerprint analyst's failure to follow the verification step of the ACE-V method renders the analyst's conclusions unreliable. Other courts appear divided on the issue. Compare United States v. Ruvalcaba-Garcia, 923 F.3d 1183, 1191 (9th

Cir. 2019) (fingerprint analyst's failure to have a second examiner verify his conclusions went to the weight of the evidence, not its admissibility), with Crew Tile Distribution, Inc. v. Porcelanosa Los Angeles, Inc., 763 F. App'x 787, 797 (10th Cir. 2019) (handwriting analyst's failure to have a second examiner verify her results rendered her methodology unreliable). The lack of clear authority about whether an analyst's failure to follow the verification step of the ACE-V process renders their conclusions unreliable, by itself, weighs against finding that it was objectively unreasonable for Ms. Yazgi not to object to Stephens's testimony. See Smith v. Singletary, 170 F.3d 1051, 1054 (11th Cir. 1999) (an attorney is not liable for an error of judgment on an unsettled proposition of law (citations omitted)).

But the question is mostly academic. Even though Stephens may not have submitted the results of his fingerprint examinations to another FDLE analyst for verification, the results were subject to verification by Ellington's own examiner, Gerald Cole. As to the driving manual, Cole reviewed duplicates of latent fingerprint impressions and copies of Ellington's fingerprint and palm print standards. Pet. Ex. F (Civ. Doc. 5-11). Cole agreed that a latent print on the handbook matched Ellington's right little finger. Id. Later, at Ms. Yazgi's request, Cole examined a latent fingerprint on the black plastic bag. See Motions Hr'g Tr. Vol. II at 2–4. Ms. Yazgi stated that if Cole determined Ellington's fingerprint was not on the bag, she would call Cole as a witness or

seek to continue the trial. Id. Because Ms. Yazgi did not call Cole as a witness or move to continue the trial, Cole presumably found nothing helpful for the defense. Thus, given that Ellington's own fingerprint expert found nothing to dispute Stephens's conclusions, Ms. Yazgi reasonably could have decided not to object to Stephens's testimony as unreliable. Ellington also fails to show that, had Ms. Yazgi objected to the admissibility of Stephens's testimony, there is a reasonable probability his testimony would have been excluded and that the outcome of trial would have been different. See Strickland, 466 U.S. at 694. Relief on this claim is due to be denied.

### D. Ground Four

Ellington alleges that Ms. Yazgi gave ineffective assistance by failing to advise him that he qualified for a guidelines reduction for acceptance of responsibility under U.S.S.G. § 3E1.1. Am. § 2255 Mtn. 8; Memorandum at 9. According to Ellington, "Ms. Yazgi failed to adequately inform him that the stipulation [he entered at trial regarding Torian Ford] … qualified Movant sentence [sic] to be eligible for a 3 pt. reduction for acceptance of responsibility." Am. § 2255 Mtn. at 8.

The United States Sentencing Guidelines provide:

(a)      If the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by **2** levels.

(b) If the defendant qualifies for a decrease under subsection (a), the offense level determined prior to the operation of subsection (a) is level **16** or greater, and upon motion of the government stating that the defendant has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently, decrease the offense level by **1** additional level.

U.S.S.G. § 3E1.1 (2015). "This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." Id., cmt. 2.

> Conviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction. In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct). In each such instance, however, a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct.

Id.; accord United States v. Rodriguez, 905 F.2d 372, 374 (11th Cir. 1990).

Ellington's claim lacks merit because he did not accept responsibility under § 3E1.1 and its commentary. True enough, Ms. Yazgi agreed to two stipulations about Torian Ford not being a suspect in the charged bank robberies. Ms. Yazgi also did not object to certain fingerprint and DNA evidence. But these were tactical choices that did not amount to an acknowledgment of guilt. Ellington made the government prepare for trial and prove its case, as

was his right. He did not go to trial merely to "assert and preserve issues that [did] not relate to factual guilt." U.S.S.G. § 3E1.1, cmt. 2. Throughout the trial, Ellington contested whether he was the person who perpetrated the bank robberies. Yet even at sentencing, and despite significant evidence against him, Ellington insisted he "had absolutely nothing to do with th[ese] robber[ies]." Sentencing Tr. at 25; (see also Crim. Doc. 87, Sentencing Memorandum at 1, 4–9). Based on his own actions, Ellington was ineligible for a guidelines reduction because he showed no remorse or acceptance of responsibility. For that he cannot fault Ms. Yazgi, who by then had been replaced by Mr. Arnold. Ellington fails to show that Ms. Yazgi performed deficiently by not advising him he was eligible for a § 3E1.1 guidelines reduction under these circumstances, and he fails to show prejudice under Strickland. Relief on Ground Four is due to be denied.

### E. Ground Five

Ellington alleges that Ms. Yazgi gave ineffective assistance by failing to "object" to the FDLE fingerprint analyst's testimony based on Federal Rules of Evidence 103(a)(1)[15] and 705. Memorandum at 9–12. Ellington alleges that Ms. Yazgi should have objected because Stephens, the FDLE analyst, did not

---

[15]     This Rule states: "(a) Preserving a Claim of Error. A party may claim error in a ruling to admit or exclude evidence only if the error affects a substantial right of the party and: (1) if the ruling admits evidence, a party, on the record: (A) timely objects or moves to strike; and (B) states the specific ground, unless it was apparent from the context." Fed. R. Evid. 103(a)(1).

possess Ellington's fingerprint standards when he first identified Ellington's fingerprints on April 11, 2014. <u>Id.</u> at 10–11. In fact, Stephens did not receive Ellington's fingerprint standards until April 14, 2014. <u>See</u> <u>id.</u> According to Ellington, under Federal Rule of Evidence 705, "Ms. Yazgi was entitled to delve into the basis of M. Stephens' opinion in detail." <u>Id.</u> at 11.

Federal Rule of Evidence 705 states: "Unless the court orders otherwise, an expert may state an opinion – and give the reasons for it – without first testifying to the underlying facts or data. But the expert may be required to disclose those facts or data on cross-examination." Fed. R. Evid. 705.

As the government points out, Rule 705 does not govern the admissibility of expert testimony. <u>See</u> Response at 10–11. Instead, Rule 705 entitles the attorney cross-examining an expert to probe the facts or data on which the expert based their opinion. Thus, if Ellington argues that Ms. Yazgi should have sought to exclude Stephens's testimony based on Rule 705, that claim fails. The remedy under Rule 705 is cross-examination, not exclusion of the expert's opinion.

To the extent Ellington argues that Ms. Yazgi should have cross-examined Stephens about the factual basis for the identification of Ellington's fingerprint before he received Ellington's fingerprint standards, this "approach would have been disastrous for Ellington." Response at 11. Stephens first identified Ellington's fingerprints without a fingerprint standard because he

used the AFIS database. As the government explains:

> The expert was able to make a match before Ellington was arrested in this case because <u>Ellington had been arrested more than a dozen times before he robbed the two banks in this case.</u> (<u>See</u> Doc. 88 ¶¶ 40–67 (PSR).) Given these prior arrests, his fingerprint standard was on file. With Ellington's fingerprint standard already in law enforcement's nationwide Automated Fingerprint Identification System (or AFIS), the expert made the match before later receiving another fingerprint standard generated after Ellington's April 14, 2014 arrest.

<u>Id.</u> (emphasis in original). For Ellington's sake, however, the government agreed not to mention the use of AFIS, since doing so would have revealed that Ellington had a criminal record. <u>See</u> Motions Hr'g Tr. Vol. I at 13–14, 49–50. As a result, Stephens did not describe <u>how</u> he first identified Ellington's fingerprint. So, it would have been counterproductive for Ms. Yazgi to have pressed Stephens about the factual basis for his original fingerprint identification, since doing so would have revealed the use of AFIS and risked exposing that Ellington had a criminal record. Ms. Yazgi wisely avoided opening that door by not cross-examining Stephens on the subject. Because Ellington fails to show that counsel's performance was deficient or prejudicial under <u>Strickland</u>, relief on this ground is due to be denied.

## F. Ground Six

Ellington alleges that Ms. Yazgi gave ineffective assistance by not moving to exclude DNA evidence that was assertedly taken in violation of Florida

Statutes Section 943.325[16] and the Fourth Amendment.[17] <u>See</u> Memorandum at 12–16. He states that, after he was arrested by Tallahassee police on April 14, 2014, a county employee took a buccal swab from him during booking at the Leon County Jail. <u>Id.</u> at 13.; <u>see also</u> Motions Hr'g Tr. Vol. I at 13.[18] Although Ellington's exact arguments are unclear, he seems to contend that the buccal swab was unlawful because the purpose of the swab was to investigate his involvement in the robbery of the Citizens State Bank, and the Perry Police Department did not have a warrant or probable cause to obtain his DNA. <u>See</u> Memorandum at 13–14. Thus, Ellington argues, the swab was a warrantless DNA search, the fruits of which were used against him, and Ms. Yazgi failed to seek suppression of the evidence. <u>See</u> <u>id.</u> at 14.[19]

When "defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness," a petitioner must "prove [1] that his Fourth Amendment claim is meritorious and [2] that there

---

[16]     Florida Statutes Section 943.325 governs the establishment and use of a statewide DNA database for investigating and identifying criminals and missing persons.

[17]     The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

[18]     Ellington insists that a <u>police officer</u> did not take any DNA evidence from him, and that his DNA was not in CODIS before his arrest. He does not explain why either is significant.

[19]     Ellington does not challenge the collection of DNA evidence from the fake beard, hat, and shirt, all of which were abandoned in the KFC parking lot.

is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice." <u>Kimmelman v. Morrison</u>, 477 U.S. 365, 375 (1986). Further,

> [a]lthough a meritorious Fourth Amendment issue is necessary to the success of a Sixth Amendment claim..., a good Fourth Amendment claim alone will not earn a prisoner federal habeas relief. Only those habeas petitioners who can prove under <u>Strickland</u> that they have been denied a fair trial by the gross incompetence of their attorneys will be granted the writ and will be entitled to retrial without the challenged evidence.

<u>Id.</u> at 382 (footnote omitted).

No Fourth Amendment violation occurred because law enforcement lawfully collected Ellington's DNA. Ellington was first swabbed for DNA at the Leon County Jail right after police apprehended him in Tallahassee, Florida under arrest warrants for the robberies of the TD Bank and First Federal Bank. <u>See</u> Motions Hr'g Tr. Vol. I at 12–13; Trial Tr. Vol. III at 65–67 (Detective Rountree testifying about obtaining two arrest warrants and receiving notice the warrants had been executed). Under Florida law, any person "[a]rrested for any felony offense or attempted felony offense" in the state "shall submit a DNA sample at the time he or she is booked into a jail, correctional facility, or juvenile facility." Fla. Stat. §§ 943.325(2)(g)2.c, (3)(a); <u>see also</u> <u>id.</u> §§ 943.325(7)(a), (b). The police may use "a match between casework evidence DNA samples from a criminal investigation and DNA samples from a state or federal DNA database" to "find probable cause for the issuance of a warrant for arrest or to obtain the DNA sample from an offender." <u>Id.</u> § 943.325(1)(b). Florida law enforcement

uploaded Ellington's DNA profile to CODIS and compared it to DNA from the fake beard, hat, and shirt used in the Live Oak bank robberies (although the jury did not hear about this initial DNA match). <u>See</u> Motions Hr'g Tr. Vol. I at 12. Two days after his arrest, FDLE Special Agent April Glover had a search warrant to obtain biological material from Ellington, including a second buccal swab for DNA. <u>See</u> Trial Tr. Vol. III at 35.

The collection of DNA from a suspect following a valid arrest supported by probable cause is a reasonable search under the Fourth Amendment. <u>Maryland v. King</u>, 569 U.S. 435, 465–66 (2013). In <u>King</u>, the Supreme Court upheld a Maryland DNA collection law much like Florida's, which authorized police to collect DNA from any person charged with a crime of violence, attempted crime of violence, burglary, or attempted burglary. <u>Id.</u> at 443. The defendant in <u>King</u> was arrested in 2009 for menacing a group of people with a shotgun. <u>Id.</u> at 441. As part of a booking procedure required under Maryland law, officers took a buccal swab from the defendant and uploaded his DNA to the Maryland DNA database. <u>Id.</u> The database matched the defendant's DNA profile with a DNA sample collected in 2003 in an unsolved rape case. <u>Id.</u> Based on that match, the state indicted the defendant for, and ultimately convicted him of, the 2003 rape. <u>Id.</u> The defendant appealed the rape conviction, arguing that collecting his DNA after the 2009 arrest, without an individualized reason to do so, violated the Fourth Amendment. The Supreme Court disagreed,

concluding:

> In light of the context of a valid arrest supported by probable cause respondent's expectations of privacy were not offended by the minor intrusion of a brief swab of his cheeks. By contrast, that same context of arrest gives rise to significant state interests in identifying respondent not only so that the proper name can be attached to his charges but also so that the criminal justice system can make informed decisions concerning pretrial custody. Upon these considerations the Court concludes that DNA identification of arrestees is a reasonable search that can be considered part of a routine booking procedure. When officers make an arrest supported by probable cause to hold for a serious offense and they bring the suspect to the station to be detained in custody, taking and analyzing a cheek swab of the arrestee's DNA is, like fingerprinting and photographing, a legitimate police booking procedure that is reasonable under the Fourth Amendment.

Id. at 465–66.

Even without a search warrant, the post-arrest collection of DNA from Ellington was permissible under Florida law, Fla. Stat. § 943.325(7)(a), and under the Fourth Amendment, King, 569 U.S. at 465–66. Ellington does not argue that the collection of his DNA did not occur in "the context of a valid arrest supported by probable cause." Id. at 465.[20] Thus, Ellington fails to show that the post-arrest collection of his DNA was illegal.

A second buccal swab was taken from Ellington two days later, after he was extradited to Suwannee County, Florida. Trial Tr. Vol. III at 35–37; see

---

[20]   Indeed, Ellington was apprehended under two arrest warrants for the charged bank robberies. See Trial Tr. Vol. III at 65–67. When the police obtained the arrest warrants, they already knew that Ellington's fingerprint was on the handbook discarded by the robber, that he drove a black Dodge Charger like the one parked behind the KFC restaurant on the day of the robberies, and that Ellington's driver's license photograph resembled surveillance images of the bank robber. See id. at 56–65.

also id. at 9–10. This time, police had a search warrant for biological material. Id. at 35. Agent Glover testified that she obtained the search warrant herself, id., and prepared the affidavit to apply for the warrant, id. at 40, 42. Ellington alleges no facts challenging the execution of the search warrant, probable cause for the warrant, or the presumptive validity of the affidavit on which the warrant was based. See United States v. Whyte, 928 F.3d 1317, 1333 (11th Cir. 2019) ("An affidavit supporting a search warrant is presumed valid." (internal citations omitted)).

It was this second buccal swab (Government's Exhibit 40) that was the basis for the DNA identification at trial. Agent Glover testified that she secured the swab and delivered it (along with other evidence) to the FDLE crime lab the next day. Trial Tr. Vol. III at 36–37. Dr. Jennifer Middlebrooks, a DNA analyst, compared Ellington's DNA from the swab to DNA from the fake beard, hat with dreadlocks, and shirt. Id. at 173–76. Dr. Middlebrooks determined that Ellington's DNA matched the major DNA profile on each item. Id. at 176.

On these facts, Ellington identifies no Fourth Amendment violation in the collection of either buccal swab.[21] The lack of a Fourth Amendment violation

---

[21] There is some evidence that law enforcement used the DNA profile from one of the two buccal swabs to investigate whether Ellington was involved in robbing the Citizens State Bank. (See Doc. 5-7, Pet. Ex. B). This fact does not transform a lawful DNA collection into an unlawful one. What matters is that both buccal swabs were lawfully taken pursuant to a valid arrest or a valid search warrant. "Evidence legally obtained by one police agency may be made available to other such agencies without a warrant, even for a use different from that for which it was originally taken." United States v. Lester, 647 F.2d 869, 875 (8th Cir. 1981). See also

dooms his ineffective assistance claim. See Kimmelman, 477 U.S. at 375. Thus, relief on this claim is due to be denied.

## G. Ground Seven

Next, Ellington alleges that appellate counsel, Shawn Arnold, gave ineffective assistance by failing to raise Ellington's "actual innocence of FDLE 40120100390," which is Ellington's way of referring to the uncharged robbery of the Citizens State Bank. See Memorandum at 16–18.

This argument is meritless. Ellington was neither charged with, convicted of, nor punished for the Citizens State Bank robbery. No evidence of Ellington's suspected involvement in the Citizens State Bank robbery was introduced at trial. And although a probation officer recommended an upward departure based on Ellington's suspected involvement in robbing the Citizens State Bank, PSR ¶ 114(a), the uncharged robbery never factored into the conviction or sentence, see Sentencing Tr. at 26–31, 34; Statement of Reasons. Thus, appellate counsel reasonably could have decided there was no point in asserting Ellington's innocence of an uncharged crime that did not affect the

---

Green v. Berge, 354 F.3d 675, 680 (7th Cir. 2004) (Easterbrook, J., concurring) ("[T]he fourth amendment does not control how properly collected information is deployed."). Moreover, law enforcement officers' subjective motives for conducting a search are not relevant under the Fourth Amendment, only the objective reasonableness of the search. See Brigham City, Utah v. Stuart, 547 U.S. 398, 404 (2006) ("An action is reasonable under the Fourth Amendment, regardless of the individual officer's state of mind, as long as the circumstances, viewed objectively, justify the action. The officer's subjective motivation is irrelevant." (internal quotation marks, citations, and alterations omitted)).

conviction or penalty. Relief on this ground is due to be denied.

### H. Ground Eight: Government misconduct

Ellington asserts that Ms. Yazgi gave ineffective assistance by failing to object to government misconduct. Memorandum at 18–21. First, Ellington alleges that the government violated his Fifth and Sixth Amendment rights because the "indictment d[id] not charge the Movant with violating Gov. ex. 33 noted FDLE 40120100390" – meaning the robbery of the Citizens State Bank. Id. at 20.[22] Nevertheless, Ellington asserts, the government introduced evidence about the uncharged robbery. Second, Ellington alleges that the government suborned perjury before the grand jury, at trial, or both, based on a discrepancy between two witnesses' testimony about the source attribution rate of the major DNA profile on the robber's disguise. Id. According to Ellington, FBI Agent Scott Waters testified before the grand jury that the DNA profile occurred in one out of 2.6 quintillion people. Memorandum at 20.[23] At trial, Dr. Middlebrooks testified that "the frequency of occurrence of the DNA profile is more rare than one in 700 billion." Trial Tr. Vol. III at 177. Ellington alleges that this discrepancy shows that the government suborned perjury, and that Ms. Yazgi's

---

[22]    Ellington repeatedly raises the lack of a "case tracking form" or "CTF" for Exhibit 33 and other lab reports. He fails to explain the significance of a case tracking form, nor does he cite any authority showing why the lack of such a form is relevant.

[23]    Ellington does not provide a copy of the grand jury transcript. The Court assumes that Ellington's description of Agent Waters's grand jury testimony is true.

failure to object was deficient performance.

### 1. Reference to uncharged bank robbery

The Fifth Amendment's Grand Jury Clause states: "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." U.S. Const. amend. V. "This clause does not 'permit a defendant to be tried on charges that are not made in the indictment against him' or convicted on theories that the indictment 'cannot fairly be read as charging.'" United States v. Feldman, 931 F.3d 1245, 1259–60 (11th Cir. 2019) (quoting Stirone v. United States, 361 U.S. 212, 217 (1960)). Relatedly, the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right … to be informed of the nature and cause of the accusation." U.S. Const. amend. VI.

The government did not violate Ellington's right not "to be tried on charges that are not made in the indictment against him or convicted on theories that the indictment cannot fairly be read as charging." Feldman, 931 F.3d at 1259–60 (internal quotation marks and citation omitted). True, the Indictment did not charge Ellington with robbing the Citizens State Bank. But equally true is the fact that Ellington was not tried, convicted, or sentenced for that offense. He was tried, convicted, and sentenced only for robbing the TD Bank and First Federal Bank. Moreover, the government did not create a variance by introducing evidence about the uncharged bank robbery. See

United States v. Keller, 916 F.2d 628, 633 (11th Cir. 1990) (a variance occurs when "the evidence produced at trial differs from what is alleged in the indictment."). As has been discussed above, the government introduced no evidence that Ellington robbed the Citizens State Bank. Because the government did not violate the Grand Jury Clause, Ms. Yazgi did not perform deficiently by not arguing that the government had done so. Freeman, 536 F.3d at 1233 ("A lawyer cannot be deficient for failing to raise a meritless claim." (citation omitted)).

### 2. Suborning perjury

"[D]eliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice." Giglio v. United States, 405 U.S. 150, 153 (1972) (internal quotation marks omitted). "To establish prosecutorial misconduct for the use of false testimony, a defendant must show the prosecutor knowingly used perjured testimony, or failed to correct what he subsequently learned was false testimony, and that the falsehood was material." United States v. McNair, 605 F.3d 1152, 1208 (11th Cir. 2010) (citations omitted). "Perjury is defined as testimony 'given with the willful intent to provide false testimony and not as a result of a mistake, confusion, or faulty memory.'" Id. (quoting United States v. Ellisor, 522 F.3d 1255, 1277 n.34 (11th Cir. 2008)). "[A] prior statement that is merely inconsistent with a government witness's testimony is insufficient to establish

prosecutorial misconduct." Id. (citations omitted). Moreover, Courts generally will "refuse to impute knowledge of falsity to the prosecutor where a key government witness'[s] testimony is in conflict with another witness's statement or testimony." United States v. Michael, 17 F.3d 1383, 1385 (11th Cir. 1994).

Ellington fails to establish that the government knowingly suborned perjury, let alone that Ms. Yazgi performed deficiently by not objecting to perjury. At most, Ellington identifies one inconsistency between Agent Waters's and Dr. Middlebrooks's testimonies about the DNA attribution rate. Yet a mere conflict between two witnesses' testimonies is not enough to establish prosecutorial misconduct. McNair, 605 F.3d at 1208; Michael, 17 F.3d at 1385. Besides, the testimonies of Agent Waters and Dr. Middlebrooks do not conflict. According to Ellington, Agent Waters testified before the grand jury that the DNA profile from the robber's disguise occurs in one in 2.6 quintillion people. Memorandum at 20. At trial, Dr. Middlebrooks testified that "the frequency of occurrence of the DNA profile is more rare than one in 700 billion." Trial Tr. Vol. III at 177 (emphasis added). These statements are not inconsistent because a rate of one in 2.6 quintillion is rarer than one in 700 billion.[24] On this record,

---

[24]     Ellington raised the same concern about the different attribution rates before trial and at sentencing. Motions Hr'g Tr. Vol. I at 15; Sentencing Tr. at 10. Ms. Yazgi explained that one test examined the likelihood that the major DNA profile on the fake beard, hat, and shirt did not come from the same person, while the other test examined the likelihood that the major profile belonged to someone other than Ellington. Motions Hr'g Tr. Vol. I at 16. So

Ms. Yazgi had no reason to argue that the government had suborned perjury. Because Ms. Yazgi did not perform deficiently, this claim fails.

## I. Ground Nine: Sentencing objections

Ellington alleges that sentencing counsel, Shawn Arnold, gave ineffective assistance by "failing to object, dispute, and argue [that] the information in the PSR violated Movant's due process pursuant to [U.S.S.G. §] 6A1.3[25] and Rule 32.1(i) [sic] Fed. R. Crim. P."[26] Memorandum at 21. Specifically, Ellington contends that Mr. Arnold gave ineffective assistance by failing to: (1) object to a paragraph in the PSR stating that Ellington was a suspect in the robbery of the Citizens State Bank, see PSR ¶ 39; (2) object to paragraph 114(a) of the PSR, in which a probation officer recommended an upward departure under U.S.S.G. § 5K2.21 because Ellington was suspected of robbing the Citizens State Bank; and (3) relitigate the evidence introduced at trial, including

---

naturally the tests reported different results. The government also explained that, due to a policy change at the FDLE lab, when the probability of a DNA profile's occurrence hits one in 700 billion, "they just cut it off." Sentencing Tr. at 10–11, 12.

[25]     Section 6A1.3 provides in relevant part: "When any factor important to the sentencing determination is reasonably in dispute, the parties shall be given an adequate opportunity to present information to the court regarding that factor. In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3(a).

[26]     There is no Rule 32.1(i) in the Federal Rules of Criminal Procedure, but there is a Rule 32(i), which governs sentencing procedures. Rule 32(i) generally ensures that the parties can review, comment on, and object to the PSR, introduce evidence and statements, and speak to the Court. See Fed. R. Crim. P. 32(i).

fingerprint and DNA evidence. Memorandum at 21–26.

The record affirmatively refutes Ellington's claim. Mr. Arnold filed written objections to the PSR, in which he objected to paragraphs 39 and 114. (Crim. Doc. 88 at 27, Objections to PSR). As to paragraph 39, Mr. Arnold asserted that Ellington "has never been charged or convicted of this crime, and therefore these allegations should be stricken from the report in their entirety." Id. Likewise, as to paragraph 114, Mr. Arnold objected to any upward departure based on Ellington's suspected involvement in the Citizens State Bank robbery. Id. The government addressed paragraph 39, stating in a handwritten remark that "Ellington is a suspect in the 2/10/14 robbery in Perry, FL, but I cannot assert that he committed it – call me…." Id. at 25 (emphasis added). The government never advocated for an upward departure based on the uncharged robbery. And the Court never mentioned or considered the uncharged robbery, which played no role in the Court's sentencing decision. See Sentencing Tr. at 26–31, 34. Rather, the Court departed and varied upward because of Ellington's grievous criminal history (which included several prior robbery convictions), the fact that Ellington committed the offenses while on supervised release, and the seriousness of the offense. Id. at 21–23, 26–28; see also Statement of Reasons.

To the extent Ellington alleges that Mr. Arnold failed to contest the DNA and fingerprint evidence, the record refutes that claim as well. Mr. Arnold filed a sentencing memorandum that, at Ellington's direction, "focus[ed] on Mr.

Ellington's arguments of innocence." Sentencing Memorandum (Crim. Doc. 87) at 1. Ellington, through Mr. Arnold, raised eight arguments about the sufficiency of the evidence, including arguments that the DNA and fingerprint evidence was flawed. See id. at 4–9. Mr. Arnold and Ellington reiterated these objections at the sentencing hearing, including Ellington's concerns about the DNA and fingerprint evidence. Sentencing Tr. at 3–12. The Court overruled the objections, explaining that the sentencing hearing was not the time or place to relitigate the jury's verdict. Id. at 9, 12.

Ellington fails to show that Mr. Arnold performed deficiently at sentencing. He also fails to show that, had Mr. Arnold further contested paragraphs 39 and 114 of the PSR or the trial evidence, there is a reasonable probability his sentence would have been lower. Strickland, 466 U.S. at 694. Thus, relief on this ground is due to be denied.

### J. Ground Ten: Denial of right to testify

Finally, Ellington alleges that trial counsel, Ms. Yazgi, gave ineffective assistance by depriving him of his right to testify. Memorandum at 26–28. Ellington asserts that, in choosing not to testify, he relied on Ms. Yazgi's assurances that she would keep out any evidence about the Citizens State Bank robbery, including Government's Exhibit 33. But Exhibit 33 came in anyway, along with other stipulations and evidence, so Ellington alleges that he decided not to testify under false pretenses. See id.

46

"[T]he appropriate vehicle for claims that the defendant's right to testify was violated by defense counsel is a claim of ineffective assistance of counsel under Strickland." United States v. Teague, 953 F.2d 1525, 1534 (11th Cir. 1992). A defendant has a fundamental right to testify at trial in his behalf, which is "personal to the defendant and cannot be waived either by the trial court or by defense counsel." Id. at 1532. Trial counsel must "advise the defendant (1) of his right to testify or not testify; (2) of the strategic implications of each choice; and (3) that it is ultimately for the defendant himself to decide whether to testify." McGriff v. Dep't of Corr., 338 F.3d 1231, 1237 (11th Cir. 2003) (citing Teague, 953 F.2d at 1533). Counsel performs deficiently where she "has refused to accept the defendant's decision to testify and refused to call him to the stand, or where defense counsel never informed the defendant of his right to testify and that the final decision belongs to the defendant alone." Gallego v. United States, 174 F.3d 1196, 1197 (11th Cir. 1999). If counsel performed deficiently regarding the defendant's right to testify, the defendant still must establish a reasonable probability that the outcome of the proceedings would have been different but for counsel's error. Nejad v. Att'y Gen., State of Ga., 830 F.3d 1280, 1290 (11th Cir. 2016).

Ellington does not allege that Ms. Yazgi failed to advise him about his right to testify or not testify, the strategic implications of each choice, or that it is ultimately for Ellington himself to decide whether to testify. McGriff, 338

47

F.3d at 1237. Nor does Ellington allege that Ms. Yazgi refused to let him testify. Rather, he alleges only that he chose not to testify based on the assumption that Ms. Yazgi would keep certain evidence out, and that because such evidence came in anyway, his decision was misinformed. See Memorandum at 26–28.

But those allegations still fail to explain why Ellington did not testify. Ellington says he expected Ms. Yazgi to keep out evidence about the Citizens State Bank robbery, and she did. The government never introduced any evidence that Ellington committed the uncharged bank robbery. Moreover, Ellington's decision not to testify could not have relied on any assumptions about certain evidence not being admitted. When the defense rested and Ellington opted not to testify, the government had already completed its presentation, so Ellington knew what evidence had been introduced. Still, he did not object when Ms. Yazgi rested without him having testified. Trial Tr. Vol. III at 195. In a conversation with the Court before trial, Ellington agreed that if the defense rested without him having testified, and if he did not speak up, the Court could assume he had chosen not to testify:

> THE COURT:      All right. Mr. Ellington, I do want to say one thing to you today, sir, because I may or may not have a chance to say it to you again before the trial starts, and that is that as the magistrate judge has advised you at your initial appearance and your arraignment, you have the right to testify at this trial and you also have the right not to testify, and that choice is entirely yours. No one can force you to testify. But you have to make that decision.
>
> THE DEFENDANT:      Right.

THE COURT:      And so you should talk to your attorney and get her advice, but ultimately it's up to you whether you testify, not up to your attorney; do you understand that?

THE DEFENDANT:      Yes, I do.

THE COURT:      And so if we get to the point in the case where your attorney stands up and announces that she rests, and you have not testified but you wish to, then you need to let me know that.

If you don't, then I'm going to assume that it was your decision not to testify. Is that fair?

THE DEFENDANT:      Right. And will this be before or after the 40(b) [sic] decision?

THE COURT:      That will be after the 404(b) decision.

***

THE COURT:      But the point … that I want you to understand is that if you ultimately don't testify at trial and you haven't let me know otherwise, then I'm going to understand it was your decision not to testify. Okay?

THE DEFENDANT:      Okay.

(Crim. Doc. 112, Status Conference Transcript at 18–19). Given this record, the Court can only interpret Ellington's silence as conveying that he chose not to testify.

Ellington also fails to establish prejudice under Strickland. Given the significant DNA, fingerprint, eyewitness, and other circumstantial evidence against him, he fails to show that even had he testified, there is a reasonable probability the jury would have acquitted him. Strickland, 466 U.S. at 694. As a result, relief on this claim is due to be denied.

49

## IV.   Certificate of Appealability

The undersigned opines that a certificate of appealability is not warranted. This Court should issue a certificate of appealability only if the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make this substantial showing, Ellington "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further,'" Miller-El v. Cockrell, 537 U.S. 322, 335–36 (2003) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)).

When a district court has rejected a petitioner's claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the claims debatable or wrong. See Slack, 529 U.S. at 484. However, when the district court has rejected a claim on procedural grounds, the petitioner must show that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Id. Upon consideration of the record as a whole, this Court will deny a certificate of appealability.

As such, and in accordance with the Rules Governing Section 2255 Cases in the United States District Courts, it is hereby **ORDERED:**

1. Petitioner Kenneth Lamar Ellington's Amended Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence (Civ. Doc. 5) is **DENIED**.

2. The Clerk is directed to enter judgment for the United States and against Ellington, and close the file.

3. If Ellington appeals the denial of the petition, the Court denies a certificate of appealability. Because this Court has determined that a certificate of appealability is not warranted, the Clerk shall terminate from the pending motions report any motion to proceed on appeal as a pauper that may be filed in this case. Such termination shall serve as a denial of the motion.

**DONE AND ORDERED** at Jacksonville, Florida this 5th day of July, 2022.

MARCIA MORALES HOWARD
United States District Judge

lc 19
Copies:
Counsel of record
Petitioner